UNITED STATES of America, Plaintiff–
Appellee, Cross–Appellant,

v.

Emory Eugene CORNOG, Defendant–
Appellant, Cross–Appellee.

No. 89–8264.

United States Court of Appeals,
Eleventh Circuit.

Oct. 30, 1991.

Jake Arbes, Atlanta, Ga., for defendant-appellant, cross-appellee.

James T. Martin, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee, cross-appellant.

Appeals from the United States District Court for the Northern District of Georgia.

Before TJOFLAT, Chief Judge, CLARK, Circuit Judge, and KAUFMAN *, Senior District Judge.

TJOFLAT, Chief Judge:

## I.

### A.

On January 5, 1989, a jury convicted Emory Eugene Cornog on one count of conspiring, between January 1987 and February 13, 1988, to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) [1] and 846 (1988) [2] and on two

---

\* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

**1.** Section 841(a)(1) makes it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

**2.** Section 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchap-

substantive counts of cocaine distribution, on February 9, 1988 and February 12, 1988, in violation of 21 U.S.C. § 841(a)(1). Following his conviction, Cornog's probation officer prepared a presentence investigation (PSI) report that assessed his offense level and criminal history score.

To determine Cornog's criminal history score, the probation officer assigned him three points for a 1972 voluntary manslaughter conviction in state court (for which the court sentenced Cornog to ten years imprisonment), see Sentencing Guidelines §§ 4A1.1(a), 4A1.2(e)(1) (Nov. 1, 1990), and one point each for two 1980 state-court shoplifting convictions (for which he received probated sentences), see id. § 4A1.1(c). With a criminal history score of five, the probation officer recommended that the district court place Cornog in crim-

inal history category III. The offense level for Cornog's drug offenses was eighteen, see id. § 2D1.1(a), and the probation officer increased it two levels, to twenty, for Cornog's participation as an organizer, leader, manager, or supervisor in the criminal activity, see id. § 3B1.1(c).

 Both Cornog and the Government filed objections to the PSI report. The Government contended that the probation officer should have considered, in calculating Cornog's criminal history score, two other convictions, one for burglary and one for assault with intent to murder, that Cornog received in 1969. If the court considered these convictions, the Government argued, it would classify Cornog as a career offender since he would then have two convictions for crimes of violence—assault with intent to murder[3] and voluntary man-

---

ter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

**3.** Cornog argues that the guidelines require us to consider his 1969 burglary conviction—which, according to Cornog, was a nonviolent felony since he was charged with burglary of a commercial establishment, not a dwelling, rather than his assault conviction since the two convictions were imposed in a related case. Sentencing Guidelines § 4A1.2(a)(2) provides that prior sentences imposed in related cases are to be treated as one sentence for purposes of the criminal history; in addition, the district court must use the longest sentence of imprisonment if concurrent sentences were imposed. Cornog, citing this guideline, contends that for purposes of determining whether the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense and thus may be classified as a career offender, we may consider only the *conviction* with the longest sentence. We believe, however, that Congress intended us to consider the nature of all convictions in related cases for purposes of the career offender determination—not simply the conviction with the longest sentence. The use of the longest sentence of imprisonment logically relates to the calculation of criminal history category under Guidelines § 4A1.1, which scores the defendant a number of points based on the length of his prior sentences; in other words, if the court that sentenced the defendant thought that the sentences should be served concurrently rather than consecutively, it would be fair only to consider the longest sentence—the district court may not

"double count" sentences when a prior court judged that a "single" sentence accurately reflected the severity of the defendant's crimes. It would be illogical, however, to ignore a conviction for a violent felony just because it happened to be coupled with a nonviolent felony conviction having a longer sentence.

In any case, we think that a conviction for burglary—even of a commercial establishment—was a crime of violence under the guidelines applicable when the court sentenced Cornog. Under the old definition, a crime of violence was

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Sentencing Guidelines § 4B1.2(1) (Nov. 1, 1987) (incorporating 18 U.S.C. § 16). The Sentencing Commission subsequently amended the guidelines, on November 1, 1989, to concentrate the inquiry on the use or threatened use of physical force against a person or a potential risk to persons. As amended, the guidelines state:

(1) The term "crime of violence" means any offense under federal or state law punishable by imprisonment for a term exceeding one year that—

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(ii) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a seri-

slaughter—on which he had been incarcerated during the past fifteen years. *See id.* §§ 4B1.1, 4A1.1(e)(1); *see infra* pp. 1507–08. This automatically would place Cornog in criminal history category VI and would mandate a total offense level of thirty-two. Sentencing Guidelines § 4B1.1.[4]

Cornog also objected to the parole officer's calculations of his total offense level and criminal history category, arguing, *inter alia,* that he did not organize or supervise the narcotics conspiracy for which he was convicted; consequently, the court should not increase his offense level by two. In addition, he contended that his two shoplifting offenses were not countable for criminal history purposes; thus, the probation officer should have placed him in criminal history category II—not III.

After consideration of Cornog's and the Government's objections, the probation officer adopted the Government's position—with career offender status Cornog's criminal history category should be increased to category VI and his total offense level to thirty-two. (The probation officer noted that, in the absence of career offender status, the court should place Cornog in criminal history category IV and assess him a total offense level of eighteen.) In the revised PSI report, the probation officer recommended a guidelines sentence of 210 to 262 months imprisonment.

### B.

On March 16, 1989, the district judge conducted a sentencing hearing. In determining the applicable guidelines range, the court first considered whether Cornog was a career offender, pursuant to Sentencing Guidelines § 4B1.1. Under this guideline, a defendant is a career offender if (1) he was at least eighteen years old at the time of the instant offense, (2) the instant offense is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. *Id.* Neither party contested the first two elements, so the court only had to consider whether Cornog had two prior applicable felony convictions. According to the guidelines, the court only may count "prior sentence[s] of imprisonment exceeding one year and one month that w[ere] imposed within fifteen years of the defendant's commencement of the instant offense ... [and] prior sentence[s] of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period." *Id.* § 4A1.2(e)(1).[5] Thus, the guidelines establish a fifteen-year window that the court uses to "count" the prior felonies, calculating back from the commencement of the instant offense, i.e., from the time the "relevant conduct" of the offense began, *see id.* § 1B1.3.

The court, in scoring Cornog's criminal history, examined four of his prior felony convictions: one for assault with intent to commit murder, one for burglary, one for violation of the Georgia Narcotics Drug Act (now repealed), and one for voluntary manslaughter.[6] Without determining the date the criminal history window opened, the court ruled that Cornog's voluntary manslaughter conviction, handed down on

---

ous potential risk of physical injury to another.
*Id.* (Nov. 1, 1990). We cannot, however, accord Cornog the benefit of the new law.

4. The Government noted that even if Cornog was not properly classified as a career offender, the 1969 convictions, when counted under Sentencing Guidelines § 4A1.1, would raise his criminal history category from level III to level IV.

5. Although the career offender provision only states that the defendant must have two prior

felony convictions for a crime of violence or a controlled substance offense, Sentencing Guidelines § 4B1.2 provides that the sentences for these convictions must be counted separately under the provisions of part A of that Chapter— thus, we consider Sentencing Guidelines § 4A1.2(e) in our determination.

6. On each of these convictions Cornog was sentenced to imprisonment in excess of one year and one month—a prerequisite to consideration under Sentencing Guidelines § 4A1.2(e)(1).

September 28, 1972, clearly was countable.[7] The court next considered Cornog's assault, burglary, and narcotics offenses. A state court handed down these convictions in 1969, but the state paroled Cornog on September 23, 1971. Since the earliest conduct alleged in Cornog's indictment occurred in January 1987, the window could not have opened before January 1972; therefore, without more, the 1969 convictions were not countable. When, on June 16, 1972, the state charged Cornog with murdering his wife, the state issued a parole revocation warrant. A jury found Cornog guilty of voluntary manslaughter on September 28, 1972, and, on May 7, 1973, the state revoked Cornog's parole with, according to Cornog, no notice to him.[8] The Government argued that, because Cornog's parole revocation meant that he served time on the burglary and assault convictions within the window,[9] they were countable felony convictions. The district court, however, without reference to a guideline, held that such a revocation was constitutionally invalid and should not be counted for purposes of the criminal history score. Since, according to the district court's determination, Cornog had only one countable felony conviction, he could not be classified as a career offender.

The court next considered what criminal history score to assign Cornog. In the PSI report, as noted above, the probation officer originally had assessed Cornog three points for his voluntary manslaughter conviction and one point each for two misdemeanor shoplifting convictions. This placed Cornog in criminal history category III. Later, the probation officer revised the PSI report, accounting for the revocation of parole with respect to his 1969 burglary and assault convictions, and, therefore, put Cornog in the career offender category. She thus recommended that the court place Cornog in criminal history category VI. The district court, without explanation, placed Cornog in criminal history category IV, even though it had determined that the parole revocation was invalid.

The court then assessed Cornog a total offense level of twenty, eighteen levels for the instant offenses and a two-level upward adjustment, pursuant to Sentencing Guidelines § 3B1.1(c), for his role as "an organizer, leader, manager, or supervisor" of the criminal activity. Cornog had contested the upward adjustment, but the court found "the evidence ... sufficient to show that at least two people possibly were working for ... [him]." Observing that, with a criminal history category IV and a total offense level of twenty, the guidelines mandate fifty-one to sixty-three months imprisonment, the court sentenced Cornog to sixty-three months imprisonment with a supervised release period of up to three years.

Cornog raises two issues on appeal. He first contests his placement in criminal history category IV, claiming that the court improperly counted a conviction on which he had been paroled and then reincarcerated after a constitutionally invalid parole revocation. Second, he claims that the court erred by applying the wrong standard of proof when it imposed the two-level upward adjustment to his offense level based upon his role in the offense. The Government cross-appeals, claiming that the court erred when it refused to classify Cornog as a career offender. We agree with Cornog; accordingly, we remand to the district court for resentencing.

## II.

Cornog contends that the district court erred by placing him in criminal history

---

7. The defendant concedes that this manslaughter conviction came within the window. Although the jury did not clearly determine when the 21 U.S.C. § 846 conspiracy began, *see infra* pp. 1509–10, at the latest, the conspiracy began on February 13, 1988, the last date charged in the indictment. This would result in a window that opened on February 13, 1973. Since, however, the Government alleged that the first substantive offense occurred four days earlier, the fifteen-year window goes back at least to February 9, 1973. Cornog was incarcerated on the manslaughter conviction on that date.

8. Cornog made an uncontested statement to this effect in the sentencing hearing, and the district court adopted it.

9. The narcotics conviction had expired at the time of his parole.

category IV; according to Cornog, the district court simply made an arithmetic mistake: it already had excluded Cornog's 1969 convictions from the career offender consideration, ruling that they were constitutionally invalid. Although the court did not explain its choice of criminal history categories, the Government posits two possible explanations, neither of which will sustain the sentence under the guidelines.

### A.

█ The Government first argues that the court properly counted Cornog's 1969 convictions for criminal history purposes even though it had refused to consider them for purposes of the career offender determination. According to the Government, this selective use of invalid convictions is sanctioned by the guidelines. We disagree; if the court properly held that the convictions were invalid—and therefore could not be counted—then it was bound to exclude them from all of its criminal history calculations. This is true even though the collateral inquiry, undertaken by the court here, is discretionary. *See infra* pp. 1510–12.[10] Consequently, we must determine whether Cornog's 1969 convictions properly are countable, determining first the applicable time period for counting his prior convictions and second whether the court should have excluded the 1969 convictions as constitutionally invalid.

### 1.

█ The first consideration in determining whether an offense is countable for purposes of Guideline § 4A1.1 is whether it comes within the applicable time period. The guidelines provide that, in computing a defendant's criminal history,

> [a]ny prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant

offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

Sentencing Guidelines § 4A1.2(e)(1). Cornog received sentences of imprisonment of more than one year and one month on each of the three 1969 convictions; consequently, if the state court imposed the sentences within the fifteen-year window or if the sentences resulted in his incarceration during that time period, then the district court must count them. *Id.*

To determine the starting date of the window, we count back from the commencement of the instant offense—when the defendant began the "relevant conduct," *see id.* § 1B1.3. Ordinarily, when the indictment charges that the offense occurred on a date certain, the calculation is simple: the court merely uses that date. Thus, on the first of Cornog's substantive counts, charging him with cocaine possession with intent to distribute on February 9, 1988,[11] the window opened on February 9, 1973. When, however, the government charges an offense, such as a conspiracy, that takes place over a period of time, some complications arise. When the indictment charges a defendant with an ongoing conspiracy, the jury may find that he and his coconspirators reached an agreement any time within the period charged and that the agreement continued throughout the period or, for example, only for one day. Unless the jury gives a special verdict or the sentencing court makes a determination based on the evidence adduced at trial, it is impossible for us to tell when the relevant conduct occurred.

In the instant case, the grand jury charged that Cornog, along with his confederates, conspired to possess and distribute cocaine "from on or about January, 1987 ... and continuing to on or about

---

10. Important interests, such as judicial economy, may be served by refusing to undertake a collateral inquiry. There is no legitimate interest, however, in undertaking the inquiry but selectively using the results—to do so would be an abuse of discretion.

11. The other substantive count charged him with cocaine possession with intent to distribute on February 12, 1988.

February 13, 1988." Although we know that the jury found him guilty on this count, we do not know when the conspiracy occurred—it could have been at any time within this period.[12] Accordingly, for purposes of this opinion, we will count back only from the last day alleged as part of the conspiracy, here February 13, 1988.[13] Since the commencement of the conspiracy offense opens the window later than do the substantive offenses, we use the earliest substantive offense date, opening the window on February 9, 1973.

### 2.

■ Since Cornog's 1969 convictions were imposed before the window opened and since the parole board granted Cornog parole on those convictions on September 23, 1971, the district court only could have considered them if the revocation of his parole on May 7, 1973 "resulted in [his] ... incarcerat[ion] during ... [the] fifteen-year [limitation] period." *Id.* § 4A1.2(e)(1).[14] It is clear, under Sentencing Guidelines § 4A1.2(k), that a revocation of parole may result in incarceration and thereby affect the time period under which sentences are counted under Guideline § 4A1.2(e)(1). Thus, the court ordinarily should count a conviction that is imposed, and on which the defendant is paroled, outside the window, when the defendant later—within the window—is incarcerated for breaching the conditions of his parole.

The district court here ruled, however, that although it otherwise would have counted the parole revocation for purposes of the career offender determination,[15] the revocation was conducted without notice, and thus was constitutionally invalid. *See Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Such convictions, according to the court, may not be considered.

As a threshold issue, we examine whether the district court had discretion to determine whether Cornog's parole revocation was constitutionally invalid. Concluding that it did, we next consider whether the district court properly decided the *Morrissey* issue, examining both the constitutional requirements for a parole revocation based on a subsequent conviction and the discretion accorded to the parole board by Georgia law.

### a.

■ The guidelines do not explicitly instruct district courts collaterally to inquire whether a parole revocation is constitutionally invalid and, if it is, to exclude it from the criminal history calculations; we therefore turn to an analogous issue that is covered by the application notes: the courts' responsibility to exclude constitutionally invalid prior convictions. At the time of Cornog's offenses, Sentencing Guidelines § 4A1.2 application note 6 provided:

12. Although it is possible that the jury found that the offense conduct in the conspiracy count occurred entirely before November 1987—the date the guidelines were implemented—neither party contends that the district court should have sentenced Cornog on that count under pre-guidelines law.

13. We note, however, that if the district court, on remand, determines that the conspiracy began prior to February 13, 1988, this is of no moment given our disposition of the case.

14. The state issued a parole revocation warrant on June 16, 1972, but there is no information in the record to indicate that it executed the warrant. Rather, it appears that Cornog had been detained (having been denied bail) pending trial on his murder charge.

15. Cornog also argues that, even if the district court could count a revocation that it con-

sidered constitutionally invalid, the revocation did not "result" in his incarceration. He contends that since at the start of the window, February 13, 1973, he already was incarcerated on the voluntary manslaughter conviction—he was convicted and imprisoned on that charge on September 28, 1972—and since all of the 1969 sentences were fully served before he was paroled on the voluntary manslaughter conviction in 1978, his parole revocation never resulted in his incarceration. Given that the parole board would have considered Cornog's 1969 sentences and subsequent parole revocation in deciding whether to release him prior to their expiration, we question whether he could prevail on this argument. We conclude, however, that the district court must resentence Cornog for other reasons.

Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted. Any other sentence resulting in a valid conviction is to be counted in the criminal history score. Convictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score. Also, if to count an uncounseled misdemeanor conviction would result in the imposition of a sentence of imprisonment under circumstances that would violate the United States Constitution, then such conviction shall not be counted in the criminal history score. Nonetheless, any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 if it provides reliable evidence of past criminal activity.

Sentencing Guidelines § 4A1.2 application note 6 (Nov. 1, 1987). This note could be read—and has been read by every court that has considered the issue—to authorize a collateral inquiry into the validity of a prior conviction even if the prior conviction had not been previously invalidated. *See, e.g., United States v. Jones,* 907 F.2d 456, 460–69 (4th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 683, 112 L.Ed.2d 675 (1991); *United States v. Davenport,* 884 F.2d 121, 122–24 (4th Cir.1989); *United States v. Dickens,* 879 F.2d 410, 411–12 (8th Cir. 1989); *United States v. Miller,* 874 F.2d 466, 469 n. 5 (7th Cir.1989). *But see Jones,* 907 F.2d at 470–84 (Wilkinson, J., dissenting). We believe, particularly after consideration of a subsequent amendment to the guidelines, that this is the correct approach.

A 1990 amendment to application note 6—although not governing in this case—clarifies that a district court may never count convictions previously held invalid in sentencing a defendant, but that it has discretion to conduct a collateral inquiry to determine whether challenged convictions, which the defendant has not previously contested, are invalid and, hence, must be ignored. The application note itself now reads:

> Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted. Also, sentences resulting from convictions that a defendant shows to have been previously ruled constitutionally invalid are not to be counted. Nonetheless, the criminal conduct underlying any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 (Adequacy of Criminal History Category).

The revised language, at first glance, seems to indicate that the court only may exclude from its consideration convictions that already have been held invalid; thus, the court would not have discretion to determine the validity of a prior conviction in the sentencing proceeding. *See United States v. Guthrie,* 931 F.2d 564, 570 n. 4 (9th Cir.1991). Appended to the application notes, however, is a "background" note that clarifies the court's duty. That note states that "[p]rior sentences, not otherwise excluded, are to be counted in the criminal history score, including uncounseled misdemeanor sentences where imprisonment was not imposed. The Commission leaves for court determination the issue of whether a defendant may collaterally attack at sentencing a prior conviction." This language demonstrates that, under the guidelines, courts only must exclude convictions that had been previously held invalid from the criminal history score. The Commission, however, left courts the discretion collaterally to examine the validity of prior convictions that the defendant had not challenged previously. We think that the same discretion is applicable to a decision collaterally to examine the validity of a parole revocation.[16]

---

**16.** In deciding whether to consider a collateral attack on a prior conviction, the court should consider the scope of the inquiry that would be needed to determine the validity of the conviction, including whether the issue is contested and whether the invalidity is apparent from the record.

#### b.

■ Since we find that the district court had the discretion to consider whether the revocation of Cornog's parole was constitutionally invalid, we now examine whether its determination was correct. In *Morrissey*, 408 U.S. at 471, 92 S.Ct. at 2593, the Supreme Court held that due process requires that "the finding of a parole violation [ ] be based on verified facts and that the exercise of discretion [ ] be informed by an accurate knowledge of the parolee's behavior." *Id.* at 484, 92 S.Ct. at 2602. The Court specified that the state must grant the parolee a preliminary hearing following arrest on a revocation warrant so that an independent officer may "determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation." *Id.* at 487, 92 S.Ct. at 2603. Later, before final revocation, the state must give the parolee an opportunity for a hearing, which "must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." *Id.* at 487–88, 92 S.Ct. at 2603.

Although these are the general protections for parole revocations, the parameters of due process are less defined in the area at issue in this case: the revocation of parole as a result of a subsequent criminal conviction. It is clear that no preliminary hearing is necessary: as the Court has held, the need for a preliminary hearing no longer exists in this situation because the conviction provides the requisite cause to believe that the parolee has violated the terms of his or her parole. *Moody v. Daggett,* 429 U.S. 78, 86 n. 7, 97 S.Ct. 274, 278 n. 7, 50 L.Ed.2d 236 (1976). The Court has left open, however, the question of whether courts must conduct a final revocation hearing. We believe that language in *Moody* suggests that, under the due process clause, they must. There, the Court stressed that when "the parolee admits or has been convicted of an offense plainly constituting a parole violation, the only remaining inquiry is whether continued release is justified notwithstanding the violation," *id.* at 89, 97 S.Ct. at 279; the Court

thereby implied that even when a parole violation clearly is established, the parolee should have the opportunity to set forth mitigating factors that might counsel against revocation. The circuits that have considered this question are in accord; they hold that a parolee has a due process right to present mitigating factors in a final revocation hearing. *See Heinz v. McNutt,* 582 F.2d 1190, 1194 (9th Cir.1978); *Moss v. Patterson,* 555 F.2d 137, 138–39 (6th Cir.), *cert. denied,* 434 U.S. 873, 98 S.Ct. 221, 54 L.Ed.2d 153 (1977); *Shepard v. United States Bd. of Parole,* 541 F.2d 322, 326–27 (2d Cir.1976), *vacated on other grounds,* 429 U.S. 1057, 97 S.Ct. 779, 50 L.Ed.2d 773 (1977); *see also Witzke v. Withrow,* 702 F.Supp. 1338, 1351–54 (W.D.Mich.1988).

There is, however, one situation in which the relevant facts are uncontested and there is no possibility of mitigation: when the parole board *must* revoke parole upon finding that the parolee has violated one of its conditions. In this instance, a final hearing is unnecessary. *See Black v. Romano,* 471 U.S. 606, 612, 105 S.Ct. 2254, 2258, 85 L.Ed.2d 636 (1985) (*Morrissey* did not consider whether a hearing was required in "a revocation proceeding in which the factfinder was required by law to order incarceration upon finding that the defendant had violated a condition of ... parole"; "[w]here such discretion exists, however, the parolee ... is entitled to an opportunity to show not only that he did not violate the conditions, but also that there was a justifiable excuse for any violation or that revocation is not the appropriate disposition."); *see also Pickens v. Butler,* 814 F.2d 237, 239 (5th Cir.) ("*Morrissey* did not hold that a state is prohibited from declaring that parole will be automatically revoked for serious violations such as conviction of a felony. *Black* ... teaches that it is only where the factfinder has discretion to continue parole that the parolee is entitled to show an excuse for the violation or that revocation is not appropriate."), *cert. denied,* 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987). Thus, only when the factfinder has discretion to continue parole is the parolee entitled to an opportunity to present mitigating factors to the court.

The question before us, therefore, is whether Georgia law gives the parole board any discretion in revoking parole when the parolee is convicted of a crime.

■ Under Georgia law in effect at the time of Cornog's parole revocation, a parolee generally was entitled to a parole hearing if he allegedly had violated the terms of his parole or conditional release. When, however, the parolee was convicted of a new crime, a final hearing was not required.[17] This did not mean, however, that parole *automatically* was revoked when the parolee was convicted of new crime. In fact, in *Balkcom v. Jackson,* 219 Ga. 59, 131 S.E.2d 551, 552 (1963), the Georgia Supreme Court held that the board must enter an order to revoke parole; if the order does not issue, then the parolee still is considered to be on parole. In *Balkcom,* the parole board postponed the revocation of Jackson's parole well past the time he subsequently was convicted. On February 24, 1954, the parole board granted Jackson parole on a robbery conviction, on which he had up to eight more years to serve. On October 11, 1954, a jury convicted Jackson, in federal court, of bank robbery and the court sentenced him to a term of eleven years and one day of imprisonment. When he was released from federal custody on September 8, 1961, the state board entered an order revoking his parole. Although Jackson conceded that he had violated the terms of his parole, he argued that he lawfully was entitled to credit the time he served on his federal sentence as time served on the sentence for which he was paroled since his parole was not officially

revoked until the state parole board entered a revocation order. The Georgia Supreme Court agreed and affirmed the lower court's decision to credit his time served.

Although *Balkcom* does not tell us whether the parole board had discretion never to enter an order, it is apparent that the parole board was able, at the very least, to determine *when* the order should issue. We think, therefore, that Cornog should have had the opportunity to petition the board, in a final revocation hearing, to inform its decision. Accordingly, we agree with the district court that a *Morrissey* violation occurred.

B.

■ Alternatively, the Government argues that the court intended to depart from the criminal history category. The court may depart if the defendant's criminal history category does not adequately represent the likelihood of recidivism or the seriousness of the past criminal conduct. Sentencing Guidelines § 4A1.3. In making this determination, the court may consider the criminal conduct underlying an invalid conviction. *Id.* § 4A1.2 application note 6. The court must, however, give the defendant notice and an opportunity to comment before it departs upward, *see Burns v. United States,* —— U.S. ——, ——, 111 S.Ct. 2182, 2187, 115 L.Ed.2d 123 (1991) ("before a district court can depart upward on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, ... [it must] give the parties reasonable notice that it is contemplating

---

17. Georgia law in effect at the time of Cornog's parole revocation provided:

 As soon as practicable after the arrest of a person charged with the violation of the terms and conditions of his parole ..., such parolee ... shall appear before the [Parole] Board in person and a hearing shall be had at which the State of Georgia and parolee ... may introduce such evidence as they may deem necessary and pertinent to the charge of parole violation.... Within a reasonable time thereafter the Board shall make finding upon such charge of parole violation ... and shall enter an order thereon rescinding said parole ... and returning such person to serve the sentence theretofore imposed upon him, with

benefit of computing the time so served on parole ... as a part of such person's sentence, or reinstating such parole ..., or shall enter such other order as it may deem proper: Provided, however, when a parolee ... has been convicted of any crime, whether a felony or a midemeanor [sic], or has entered a plea of guilty thereto, in a court of record, his parole ... may be revoked without a hearing before the State Board of Pardons and Parole.
1965 Ga.Laws 478, 480. This provision subsequently was amended, but still does not provide for a final revocation hearing when the parolee is convicted of a crime. *See* Ga.Code Ann. § 42–9–51(a) (1989).

such a ruling"), and then, if it still decides to depart, state specific reasons for its departure, 18 U.S.C. § 3553(c)(2) (1988). If it fails to do this, we must remand for resentencing. *See, e.g., United States v. Delvecchio,* 920 F.2d 810, 813 (11th Cir.1991). Here, the district court gave no indication that it intended to depart nor did it explain its reasons, and thus the court's placement of Cornog in criminal history category IV cannot be justified on this ground.

### III.

Cornog also argues that the district court should not have adjusted his offense level for his role in the offense. The district court first found Cornog's offense level to be eighteen, which Cornog does not dispute. Additionally, however, the district court made a two-level upward adjustment, pursuant to Sentencing Guidelines § 3B1.1(c), for Cornog's role as "an organizer, leader, manager, or supervisor" of the criminal activity. Cornog contends that the district court utilized the wrong standard of proof in reaching this conclusion.

Although the government need not prove the facts used in sentencing beyond a reasonable doubt, *United States v. Alston,* 895 F.2d 1362, 1373 (11th Cir.1990), it must, under the guidelines, prove such facts by a preponderance of the evidence. *See, e.g., United States v. Bennett,* 928 F.2d 1548, 1556 (11th Cir.1991); *United States v. Terzado-Madruga,* 897 F.2d 1099, 1125 (11th Cir.1990). The district court here concluded, however, that "the evidence [wa]s sufficient to show that at least two people were possibly working for ... Cornog." We cannot tell from the court's language whether it utilized the proper standard; thus we remand the case for resentencing to ensure that the proper standard of proof is applied.

### IV.

We VACATE the appellant's sentences and REMAND this case to the district court for resentencing in accordance with this opinion.

IT IS SO ORDERED.